IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STANLEY B. HINES,

    Petitioner,

v.

JOE MCGRATH, Warden,

    Respondent.
                          /

No. C 04-04233 CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

    Before the court is petitioner Stanley Hines' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner seeks relief on the grounds that he was denied due process and by the omission of accomplice instructions with respect to witnesses K.W. and Jamar and the admission of an out of court statement. For the reasons that follow, the court DENIES the petition for a writ of habeas corpus.

I.

    On May 11, 2001, petitioner was convicted by a jury in the Superior Court of the State of California in and for Lake County of murder with the special circumstances that the murder occurred during the commission of a robbery, kidnaping, and carjacking. He is currently serving a life sentence at Pelican Bay State Prison.

    On August 4, 2003, the California Court of Appeal affirmed the judgment of conviction and on October 22, 2003, the Supreme Court of California denied review.

On October 6, 2004, petitioner filed this instant petition for a writ of habeas corpus. The court found that it stated cognizable claims for relief, when liberally construed and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer.

## II.

The California Court of Appeal summarized the facts of the case as follows:

Prosecution

At the jury trial, K.W. testified as to the events that occurred on November 4, 1998. At that time, K.W. lived in the home of Roxanne W.; he was Roxanne's nephew. Also living at the house were Camille S., and several other people, including Camille's boyfriend, [petitioner]. Jamar P. also often spent the night at the house.

During the evening of November 4, [petitioner] and K.W. were walking by a nearby pizza place. K.W. testified that Jamar was not with them. Michael Lowry (Lowry) pulled up in his automobile and asked the two of them if they wanted to buy cigarettes for two dollars a package. [Petitioner] wanted to buy a package, but he only had large bills and Lowry did not have any change. Consequently, Lowry agreed to drive [petitioner] and K.W. to the nearby gas station so [petitioner] could get change.

After [petitioner] received change at the gas station, he gave Lowry two dollars for the cigarettes. Lowry then began driving [petitioner] and K.W. back to the pizza parlor parking lot. While Lowry was driving, [petitioner] pulled out a .380 semiautomatic, pointed it at Lowry, and told him to "break yourself." K.W. explained that this was slang for "give me what you got." [Petitioner] told Lowry to drive and occasionally directed him to turn at certain intersections. K.W. asked to be let out of the car, but [petitioner] would not let Lowry stop.

At [petitioner's] direction, Lowry drove up a dirt trail. Lowry told [petitioner] that he could keep the car and that he would not say anything to anyone if [petitioner] would just let him go. [Petitioner] commanded Lowry to stop the car near a tree; [petitioner] got out and ordered Lowry out of the car. Lowry got out of the car and told [petitioner] that he could have the car and that he just wanted his asthma inhaler from it. [Petitioner] responded, "[You] won't need it." [Petitioner] then shot Lowry, who fell to the ground. n2

> n2 Lowry died from a single gunshot wound to the head; shot at close range. Markings on the .380 caliber bullet recovered from Lowry's skull were consistent with the bullet being fired from a .380 semiautomatic gun.

[Petitioner] returned to the car and drove away. K.W. testified that he was too scared to run away. After getting gas for the car, [petitioner] drove home. A number of people were in the house when they returned. K.W. told Camille that [petitioner] was "crazy" and that he had "shot somebody." K.W. also told Roxanne about the events and that [petitioner] killed a person. Roxanne told him to go to the police, but K.W. was too scared.

2

Roxanne testified that when K.W. came home that night, he told her that [petitioner] killed Lowry because Lowry had seen his face. She also testified that sometime after he came home that night, [petitioner] told her that he had "smoked" or "smothered" someone. She explained that both of those words were slang terms for kill. She also confirmed that [petitioner] and K.W. had left the house together the night of November 4 and had returned together in the early morning hours of November 5. While they were gone, she testified that Jamar came over and had been home for a while prior to the return of K.W. and [petitioner].

Camille testified that [petitioner] and K.W. left together on November 4 and returned together in the early hours of November 5. She also testified that Jamar came over and was at home before [petitioner] and K.W. returned. She also confirmed that K.W. told her that [petitioner] was crazy and that he had just shot someone.

The following morning, [petitioner] told Camille that he shot someone. He told her that Lowry was "looking at him funny" so he pulled out his gun and told him to give him his money and drive. He said that Lowry only had the two dollars [petitioner] had paid him for the cigarettes. He then related the events, which were essentially the same as K.W.'s rendition.

After [petitioner] had returned from shooting Lowry, Camille saw a gun and an unfamiliar leather wallet on the dresser in their bedroom. The wallet contained Lowry's identification, along with the pink slip to his car. [Petitioner] later said he threw the wallet into some bushes and Camille destroyed the pink slip.

Jamar testified that on November 4 his Ford Bronco broke down in the parking lot of a grocery store and he left it there. He received a ride to Gina D.'s house, where he spent the day and evening. Sometime after midnight, Gina drove Jamar back to the grocery store. He was unable to start his car so he went over to Roxanne's house about 2:00 a.m., prior to the return of [petitioner] and K.W. He went to sleep on the couch in the living room.

On November 5, Jamar borrowed a car starter from a friend and went to the grocery parking lot and started his car. That evening, he was driving down Old Highway 53 in Clearlake when he saw [petitioner] standing by the side of the road trying to flag him down. [Petitioner] asked Jamar for help pushing his car. [Petitioner] got behind the wheel of the car and Jamar used his Ford Bronco to push the car from behind. After pushing some distance, [petitioner] eventually steered the car through some bushes off the side of the road and into a field. Jamar heard a loud noise and saw that the car was on fire. [Petitioner] got into the Bronco and Jamar drove him to a store.

Tonya P. testified that [petitioner] came over to her house at around 11:00 p.m. on the night of November 5. He told her that he needed to "lay low." A short time later, Camille and her two children took a cab over to Tonya's house and stayed there with [petitioner]. [Petitioner], Camille, and the children left the next day for Alameda County, getting a ride from [petitioner]'s friend Frank A.

Frank testified that [petitioner] came by in the afternoon of November 5 and gave him a box containing a loaded, .380 caliber semiautomatic gun. The next evening, [petitioner] asked Frank for a ride to the Bay Area and asked for his gun back. Frank brought the gun over to Tonya's house when he came to get [petitioner]. [Petitioner] took the gun and wiped off any fingerprints. Frank drove [petitioner], Camille, and Camille's children to the Bay Area.

3

**United States District Court**
For the Northern District of California

1  As soon as [petitioner] and Camille left town, K.W. and Jamar went to the police and reported what happened. K.W.'s statements to the police were essentially the same as his testimony at trial.

While in the Bay Area, Camille testified that [petitioner] told her that he had thrown the gun into the bay off the Berkeley Pier. [Petitioner], Camille, and Camille's children later stayed with Camille's aunt, Kathy F., who lived in the East Bay. Camille returned to Clearlake and [petitioner] remained with Kathy.

Kathy testified that [petitioner] responded as follows, after she asked him what was wrong, "Basically, for 187." She asked [petitioner] whether he did it and he responded that he had. He told her that K.W. was with him. [Petitioner] set forth the events, explaining that Lowry had offered to sell them cigarettes and that he pulled his gun when he returned to the car. His explanation for killing Lowry was that he did not know what else to do since he had already pulled his gun on him. At a later date, [petitioner] told her that Jamar helped him push Lowry's car into the field. At some point, [petitioner] and Kathy began having sexual relations. In January 1999, Camille walked into the house and observed Kathy and [petitioner] in bed together. Camille threatened [petitioner] with a kitchen knife and left.

On February 26, 1999, the police arrived at Kathy's house with a warrant for [petitioner's] arrest. They found him hiding in the crawlspace underneath the basement. In interviews with the police, [petitioner] denied killing Lowry and said that Jamar committed the crimes.

At trial, several of the key witnesses testified about threats they received from [petitioner] to dissuade them from testifying. K.W. testified that [petitioner] called him before the preliminary hearing and told him not to testify. [Petitioner] said that if K.W. went to court and testified, he would be killed. [Petitioner] called another time and told K.W. that if he were convicted, K.W. would die. Jamar also testified that he received threatening phone calls.

Kathy received a letter n3 from [petitioner] while he was in jail, which stated the following: "Cat, you don't got nine lives. Tell [Roxanne] I said hi and I got her address. Oh, yeah, I know where your nephew [K.W.] at, too. I got that address. I wonder how long the flies think they can fly without getting swatted. I recommend you talk to the family in case you think I am still joking . . . . [P] . . . [P] Talk to the family. We don't need no more mishaps and watch the kids. It is danger out there. We don't want nobody to get snatched or come up miss. Take care of my kids. Also, don't forget . . . to talk to the family because it seems like all of them are in danger . . . . [P] . . . [P] Oh, yea. How is your mother doing? I should send somebody over to Berkeley to tell her I said hi. . . ."

   n3 All the quoted references to the letter and "kite" throughout the opinion are as they appear in the original document and misspellings, grammar, and punctuation have not been corrected. The text in brackets has been added.

The letter also stated: "I found a way to talk to some big people in a Thug Life Association to get you kicked out of the game and maybe a kid or two. Remember, I'll find out if you expose my business, so don't break the rules. That is not nice. But talk to the family. . . . [P] . . . [P] I'm trying to warn you. Talk to the family. This is the last warning."

4

**United States District Court**
For the Northern District of California

Jail officials also intercepted two letters written by [petitioner] and addressed to his friends. The first letter stated in pertinent part: "Yah need to send a nigga a kite. Check game. This letter getting pushed out of the mail through different means. You feel? Ain't nobody seeing this but me and yah. Check game! I got trial on February 5th, 2001, 8:15 a.m. . . .

"Check game! I'm beatin my case family love one, the only thing holding me down is this snitch ass family. I need you to make an example out of somebody. You feel? It's this bitch I used to fuck with that's the auntie to the eyewitness in my case. She talking too. I need some help cousin. Everybody else acting like bitches. You know if you was crossed up, couso, I'll be the first motherfucker on the tray to ride on the fucka. I need you and Oevonne or somebody to go shoot up this bitch house. Shit, set the mutha fucka on fire or something, I ain't giving a fuck, but I will need some action to prove a new that fucka could be touch if they keep jawsin. You feel? Nigga, put the nine to use or something. I ain't trippin. I just need someone to hit this house with something they won't forget. You feel? And to give them a call later and ask for a bitch named Kathy and tell her death is next for anyone in her family if even one of them come and talks. You feel me?

"I need this bad, cousin. They the only reason I ain't touch down yet. Without them I am home free. Here's the bitch address, number, name, Kathy, . . . Berkeley . . . .

"I need this to go down as soon as possible couso. I'm trying to get back. This is my last play. Boy, I'll owe you for a lifetime on this one. That's real.

"If you feel incapable of handling it, tell Killa Cheryl. I ain't got they address. Family, this is my last play. Do this for your love one. You ain't got to shoot up the house, but I need something to happen to the house on a late night. You feel?

"Why she in it. She the bitch I drove through went. Everybody going bad on your couso. She need to be popped, but that'll come after. I touch down, they all got problems. Handle that for me love one! I'll take care of you when I touch down. That's the tray. Boy, get at me. I'll try to call soon, get at me and tell me if you handled it. Just say yeah is handled or naw.

"Love one, this is my last chance. They trying to give your boy life without the possibility of parole! I gots to get back! Stay up boy and stay real to this shit."

The second letter was addressed to a friend in Sacramento. At this time, Camille and Roxanne had moved to Sacramento. The letter stated in relevant part: "Jessie, what's up family? I'm at you to see what's real. I need your assistance. Remember our little discussion? Here's the scoop. Check game! I need for you to let something go up out your Glock piece on these spots. Handle this for your folks and I'll pay dearly. Skrilla scratch paper $ . Here's the numbers and addresses. [Addresses of Camille and Roxanne in Sacramento.]

"Tell bitch come to court her newborn baby dies! Boy get at your folks. I called one time you wasn't home. I'll holla at you when I can. Stay up out there boy. I am outy! Much love, $ $ steal 2000. [P] Get at me, make these mutha fuckas feel something and be safe out there boy. . . ."

5

Defense

[Petitioner] testified, and he repeated much of what he had told the police earlier in his two interviews. He said that Jamar was with K.W. and him in Lowry's car and that Jamar pulled out the gun and shot Lowry. He testified that both K.W. and he were surprised and wanted to get out of the car. Jamar solicited [petitioner's] assistance in disposing of Lowry's car, and [petitioner] reluctantly agreed to help.

[Petitioner] admitted that he had a gun, but he claimed that he had loaned it to Frank prior to the murder. He said that Frank returned the gun when he drove them to the Bay Area because he needed the gun for protection. He said that he later threw the gun away in a dumpster because he did not want the gun in the house with Camille's children around. He also said that he lied to the police about going to Sacramento after the murder.

[Petitioner] admitted writing the threatening letters to Kathy and to his friends. He claimed that he only wrote the letters because he felt hurt, betrayed, and "trapped" by the people he loved. He asserted that the letters had nothing to do with the murder of Lowry. He denied that he ever admitted killing Lowry to Camille, Roxanne, or Kathy.

People v. Hines, 2003 Cal. App. Unpub. LEXIS 7503, at *3-15 (1st Dist. Aug. 4, 2003).

### III.

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S.362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

6

1   federal law erroneously or incorrectly. Rather, that application must also be unreasonable."
2   Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask
3   whether the state court's application of clearly established federal law was "objectively
4   unreasonable." Id. at 409.

5       The only definitive source of clearly established federal law under 28 U.S.C. §
6   2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the
7   state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).
8   While circuit law may be "persuasive authority" for purposes of determining whether a state
9   court decision is an unreasonable application of Supreme Court precedent, only the Supreme
10  Court's holdings are binding on the state courts and only those holdings need be
11  "reasonably" applied. Id.

12                                               IV.

13      Petitioner sets forth three claims in support of his petition for a writ of habeas corpus.

14  **A.  Accomplice Instructions For K.W.**

15      1. The court turns first to petitioner's claim that the he was denied due process when
16  the trial court failed sua sponte to provide accomplice jury instructions CALJIC No 3.13 and
17  3.18 for K.W. CALJIC No. 3.11 provides that the jury "cannot find a defendant guilty based
18  upon the testimony of an accomplice unless that testimony is corroborated by other evidence
19  which tends to connect [the] [that] defendant with the commission of the offense." CALJIC
20  No. 3.11. CALJIC No. 3.18 provides that "to the extent that an accomplice gives testimony
21  that tends to incriminate [the] [a] defendant, it should be viewed with caution." CALJIC No.
22  3.18.

23      In reviewing petitioner's claim, the California Court of Appeal found no error in the
24  trial court's failure provide an accomplice jury instruction for K.W. People v. Hines, 2003
25  Cal. App. Unpub. LEXIS 7503, at *18-19. The court stated:

26  > With regard to K.W., [petitioner] argues that because K.W. was in the car with
    > Lowry when he was kidnapped, robbed, and murdered and because he invoked
27  > his Fifth Amendment privilege against self-incrimination until provided
    > immunity by the prosecution for his testimony, there was substantial evidence
28  > to require an accomplice instruction. However, "'the weight of authority and
    > sound law require proof that an aider and abettor act with knowledge of the

7

> criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" [] A person's presence at the scene of the crime or the person's failure to prevent its commission is insufficient to establish aiding and abetting. [] Here, the record contains no evidence that K.W. acted with guilty knowledge with the purpose of aiding and abetting [petitioner]. Indeed, [petitioner], himself, testified that K.W. was surprised about the shooting and requested to be let out of the car. [Petitioner] may have maintained that Jamar killed Lowry, but he never implicated K.W. as encouraging or facilitating the robbery, carjacking, or murder. Further, the grant of immunity is not sufficient by itself to warrant giving accomplice-testimony instructions. []
>
> We therefore conclude that the record contains no admissible evidence that K.W. was more than an eyewitness to the crimes. Accordingly, the court did not err in failing to give an accomplice instruction in connection with K.W.

Id. (citations omitted).

2. A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S.145, 155 (1977)). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See id. Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S.at 155).

If constitutional error is found, the court also must find that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting relief in habeas proceedings. See Calderon v. Coleman, 525 U.S.141, 146-47 (1998) (citing Brecht v. Abrahamson, 507 U.S.619, 637 (1993)).

3. Due process does not require that an instruction be given unless the evidence supports it. See Hopper v. Evans, 456 U.S.605, 611 (1982); Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985), amended, 768 F.2d 1090 (9th Cir. 1985). Here, the evidence does not point to K.W. as an accomplice to the murder. No testimony implicates K.W. in the murder. K.W. testified he did not have advance knowledge of the crime, asked to be let out of the car, and did not participate in the crime. Even petitioner's testimony supports this portion of

8

K.W.'s testimony.  Although petitioner maintained Jamar committed the murder, he never implicated K.W.  Quite the contrary, petitioner maintained throughout the trial that both he and K.W. did not participate in the murder.  The evidence does not support an accomplice jury instruction for K.W.  Accordingly, the failure of the trail court sua sponte to issue an accomplice jury instruction did not violate petitioner's due process rights.  See Hopper, 456 U.S. at 611.

Moreover, the failure to provide CALJIC Nos. 3.11 and 3.18 did not prejudice petitioner.  Even if a constitutional error is found, the court also must find that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting relief in habeas proceedings.  Although giving CALJIC Nos. 3.11 and 3.18 would have placed more scrutiny on K.W.'s eyewitness account of the crime, this additional doubt would not have had a substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 637.  Three different witnesses testified that petitioner admitted his role in the murder.  Roxanne testified that "[petitioner] told her that he had 'smoked' or 'smothered' someone." People . Hines, 2003 Cal. App. Unpub. LEXIS 7503, at *5.  Camille testified that:

> [petitioner] told [her] that he shot someone. He told her that Lowry was 'looking at him funny' so he pulled out his gun and told him to give him his money and drive. He said that Lowry only had the two dollars [petitioner] had paid him for the cigarettes. He then related the events, which were essentially the same as K.W.'s rendition.

Id. at *6.  Kathy testified that "after she asked him what was wrong" the "[petitioner] responded . . . 'Basically, for 187'" Id. at *9.  Petitioner told her he had committed the crime and then "set forth the events, explaining that Lowry had offered to sell them cigarettes and that he pulled his gun when he returned to the car."  Id.  Finally, petitioner fled the jurisdiction, admitted possessing and disposing of a gun, and sent threatening letters to witnesses.

Based on the lack of evidence implicating K.W. as an accomplice, the California Court of Appeal reasonably determined that jury instructions CALJIC Nos. 3.11 and 3.18 were unwarranted.  And even if such instructions were warranted, it is clear that the failure to provide them did not result in actual prejudice.  Petitioner is not entitled to federal habeas

9

relief on his claim that the trial court failed sua sponte to instruct the jury on CALJIC Nos. 3.16 and 3.18. The state court's rejection of the claim was not contrary to, or involved and unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d).

**B.     Accomplice Instructions For Jamar**

1. The court turns next to petitioner's claim that he was denied due process when the trial court failed sua sponte to provide accomplice jury instructions CALJIC Nos. 3.13 and 3.18 for Jamar.

The California Court of Appeal found that the evidence did not support accomplice jury instructions CALJIC Nos. 3.13 and 3.18 and, even if the evidence did support the jury instruction, the error was harmless because of sufficient corroborating evidence. People . Hines, 2003 Cal. App. Unpub. LEXIS 7503, at *19-22. The court stated:

> With regard to Jamar, [petitioner] told the jury that Jamar committed each of the crimes, and, therefore, he claims the court should have given CALJIC Nos. 3.11 and 3.18. The People respond that the evidence was either that Jamar was not at the murder scene or, under [petitioner's] version, Jamar committed the murder, robbery, and carjacking. Thus, the facts did not support an accomplice theory, but a theory that Jamar either committed the crimes or he did not.
> . . .
>
> Even if we presume that the accomplice instructions should have been given in connection to Jamar, we conclude that any error was harmless.
> . . .
>
> Here, there was sufficient corroborative evidence. Jamar's testimony was corroborated by [petitioner's] own, separate, admissions to Kathy, Camille, and Roxanne. Further, K.W. testified that he saw [petitioner] kill Lowry. As soon as [petitioner] left the county, K.W. voluntarily went to the police to tell them that he had seen [petitioner] kill Lowry. Further, Jamar had an alibi for the time of the offense, and the people in Roxanne's house reported seeing [petitioner] and K.W. leave the house together the night of the murder and return together. Not only did they report that Jamar was not with them at those times, they stated that Jamar returned to the house the night prior to the arrival of [petitioner] and K.W. Finally, [petitioner's] consciousness of guilt was amply established when he told Tonya the night after the murder that he had to "lay low"; he fled the county; he hid from the police for several months; he disposed of his gun; and he wrote threatening letters to Kathy and to his friends asking them to harm the witnesses who were to testify against him at trial.
>
> Accordingly, even presuming that the court should have provided the accomplice instructions with regard to Jamar, we hold that giving the instruction would not have made it reasonably probable that [petitioner] would have received a more favorable verdict on the charges.

Id.

2. As with the accomplice instruction for K.W., the evidence does not support accomplice instructions for Jamar. The only testimony indicating Jamar in the murder was from petitioner. Rather than aiding in the murder, petitioner testified that Jamar was wholly responsible. Id. at 19. But CALJIC No. 3.10 defines an accomplice as a person who is "subject to prosecution for the identical offense charged . . . against the defendant on trial by reason of [aiding and abetting] [or] [being a member of a criminal conspiracy]." CALJIC No. 3.10. Petitioner did not accuse Jamar of aiding and abetting or of being a member of a criminal conspiracy. The evidence does not support a jury instruction that Jamar was an accomplice in the murder. The court's failure to provide accomplice instructions did not amount to a constitutional violation. See Hopper, 456 U.S. at 611.

Further, the court agrees with the state appellate court that even if accomplice instructions were required for Jamar, such an error was not prejudicial. Although giving CALJIC Nos. 3.11 and 3.18 would have placed more scrutiny on Jamar's testimony, this additional doubt would not have had a substantial and injurious effect on the verdict. See Brecht, 507 U.S. at 637. As recounted above, three different witnesses testified that petitioner admitted his role in the murder. The evidence against petitioner was overwhelming.

Petitioner is not entitled to federal habeas relief on his claim that the state court failed to provide an accomplice instruction for K.W. because the evidence did not support it. Further, the state court's rejection of the claim was not contrary to, or involved and unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d).

**C.     Admission of K.W.'s Statement**

1. Finally, the court turns to petitioner's claim that the admission of K.W.'s statement to Camille violated the Sixth Amendment right to confrontation and due process right to a fair trial.

The California Court of Appeal found that the statements were admissible as prior consistent statements and, even if they were admitted in error, the error was harmless. People v. Hines, 2003 Cal. App. Unpub. LEXIS 7503, at *23-24. The court stated:

11

> At trial, Camille testified that K.W. told her that [petitioner] was crazy and that [petitioner] killed Lowry. The court ruled that the statement was admissible under Evidence Code section 791, because it was being offered as a prior consistent statement to support K.W.'s credibility. The defense had implied that K.W. and Jamar had met prior to going to the police and both had agreed upon the story to tell the police. [Petitioner] maintains that these statements were inadmissible hearsay and the court committed prejudicial error by admitting this hearsay testimony.
>
> Even if we were to presume that these statements were inadmissible hearsay, [petitioner] has failed to establish prejudice. [Petitioner] argues that K.W. was the prosecution's chief witness and he was the only eyewitness; thus, his credibility was pivotal to the prosecution. Consequently, [petitioner] argues that this testimony that bolstered his credibility must have been prejudicial.
>
> Here, however, the evidence against [petitioner] was overwhelming. As discussed ante, [petitioner] told a number of people that he had killed Lowry. Camille testified that she saw a gun and Lowry's wallet on the dresser in the bedroom that she shared with [petitioner]. In addition, [petitioner] fled, admitted disposing of a gun, and wrote threatening letters to witnesses. Accordingly, there is no reasonable likelihood that [petitioner] would have received a more favorable outcome had the court excluded Camille's statement that K.W. had admitted to her that he had killed Lowry.

Id.

2. The Confrontation Clause generally forbids the use of out-of-court testimonial statements, where the petitioner has not had a prior opportunity to cross-examine the declarant. Crawford . Washington, 541 U.S. 36, 59 (2004).  However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 59 n.9.  "[W]hen the declarant appears for cross examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Id.

This court need not distill whether K.W.'s out-of-court statements were testimonial because the statements were not offered for the truth of the matter asserted.  The California Court of Appeal's reasoning on this issue is persuasive.  Because the defense had "implied that K.W. and Jamar had met prior to going to the police and both had agreed upon the story to tell the police," K.W.'s statement to Camille before this alleged meeting amounts to a prior consistent statement.  The statement was not offered for its truth, but to bolster the credibility of K.W. after a contrary defense accusation.  Further, the declarant of the statement at issue,

12

K.W., appeared for cross-examination at trial.  The use of K.W.'s out of court statement did not violate the Confrontation Clause.  See id..

3.  A state court's evidentiary ruling amounts to a violation of due process, allowing federal habeas corpus relief, only if the ruling renders the state proceedings fundamentally unfair.  Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).  Even then, habeas relief is appropriate only if the error resulted in actual prejudice, i.e., if the error had a substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 637.

4.  Even if the admission of K.W.'s statement to Camille amounted to a violation, either a violation of due process or a violation of the Confrontation Clause, petitioner was not prejudiced.  This court agrees with the California Court of Appeal that "the evidence against [petitioner] was overwhelming."  People v. Hines, 2003 Cal. App. Unpub. LEXIS 7503, at *23.  As recounted above, three witnesses testified that the petitioner admitted he committed the murder.  Petitioner fled the jurisdiction after the murder, admitted possession and disposing of a gun, and wrote threatening letters to witnesses.  Under the circumstances, it simply cannot be said that K.W.'s statement to Camille had a substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 637.

V.

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: March 31, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE